UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS WARREN,<br><br>                    Plaintiff,<br><br>vs.<br><br>JOHN JAYNE, Boise Police<br>Department,<br><br>                    Defendant. | Case No. 1:23-cv-00319-DKG<br><br>**THIRD REVIEW ORDER** |

This case was reassigned to this Court as a result of all parties' consent to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. Dkt. 24. The operative pleading in this case is an Amended Complaint filed on December 6, 2023. Dkt. 9. Earlier in this prisoner civil rights matter of Plaintiff Thomas Warren (Plaintiff), United States District Judge B. Lynn Winmill ordered Defendant Boise police officer John Jayne, to prepare and submit a Martinez Report to provide additional facts regarding Plaintiff's welfare check and arrest that are the subject of his claims. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978). Defendants have filed their report. Dkt. 19. Though optional, Plaintiff has filed no substantive response or objection to the Martinez Report and its attachments, but has filed several requests to know the status of the case.

**THIRD REVIEW ORDER - 1**

## REVIEW OF AMENDED COMPLAINT AND MARTINEZ REPORT

### 1. Standard of Law for Screening Prisoner Pleadings

Federal Rule of Civil Procedure 8 requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Prison Litigation Reform Act (PLRA)[1] requires the Court to screen all pro se prisoner and pauper complaints to determine whether they have stated a claim upon which relief can be granted before such complaints are served on the defendants. 28 U.S.C. §§ 1915 & 1915A. The Court must dismiss any claims that are frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B). The Court liberally construes a plaintiff's pleadings to determine whether the case should be dismissed for lack of a cognizable legal theory or failure to plead sufficient facts under the *Iqbal/Twombly* standard. The Court also has authority to seek additional information from the parties to assess Plaintiff's claims during the screening process by requiring an amended complaint and/or a Martinez report.

In *Martinez*, rather than dismissing the complaint or sending it out for service and an answer, the district court ordered prison officials to conduct an investigation of the incident to include an interrogation of those concerned. The transcripts of the interrogations and an explanation by the officials were to be provided to the court to

---

[1] Pub. L. No. 104-134, 110 Stat. 1321, *as amended*, 42 U.S.C. § 1997e, *et seq.*

**THIRD REVIEW ORDER - 2**

enable it to decide the jurisdictional issues and make a screening determination under 28 U.S.C. § 1915(a). *Id.* at 319. The United States Court of Appeals for the Ninth Circuit approved the use of Martinez reports in *In re Arizona*, 528 F.3d 652, 659 (9th Cir. 2008), concluding that, "[a]s a permissible option within its broad discretion, a district court in an appropriate case can issue a Martinez-style order that is reasonably tailored to the pretrial needs of the district court to assess the case."

Plaintiff brings claims under 42 U.S.C. § 1983, the civil rights statute, which is an implementing statute authorizing private causes of action under the Amendments to the United States Constitution. To state a claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

### 2. Factual Allegations

Plaintiff admits that, on June 30, 2022, he and his wife had an argument about his alcoholism and he had sent "drunken texts" to his wife. Plaintiff's wife had left the house, and Plaintiff was sleeping when officers arrived for a "welfare check." *See* original Complaint, Dkt. 3. Four Boise Police officers, including Defendant John Jayne, came to Plaintiff's house after receiving a request from Plaintiff's wife to perform a welfare check on Plaintiff.

Plaintiff alleges that Officer Jayne arrested him without probable cause or a warrant. Plaintiff also alleges that Officer Jayne unnecessarily applied a chokehold to Plaintiff's neck, causing bruises, cuts, and abrasions. Finally, Officer Jayne allegedly

unnecessarily placed Plaintiff in an involuntary medical hold in the Intermountain

Hospital for a period of 144 hours. Plaintiff seeks monetary damages of $50,000. *See*

Dkt. 9.

### 3. Arrest without Probable Cause or Warrant

Plaintiff alleges that Officer Jayne arrested him without probable cause or a

warrant. Involuntary confinement or civil commitment is a significant deprivation of

liberty that requires due process protections. *See Addington v. Texas*, 441 U.S. 418, 425

(1979). *Cf. Maag v. Wessler*, 960 F.2d 773, 775–76 (9th Cir. 1992) (per curiam).

Warrantless searches and seizures are presumed to be unreasonable and therefore violate

the Fourth Amendment. *State v. Weaver*, 127 Idaho 288, 290, 900 P.2d 196, 198 (1995).

A state actor may overcome this presumption by demonstrating that a warrantless search

either fell within a well-recognized exception to the warrant requirement or was

otherwise reasonable under the circumstances. *Id*.

Where a crime is not initially at issue, a search or detention may be reasonable

under an officer's "community caretaking" function. *State v. Cutler*, 143 Idaho 297, 302,

141 P.3d 1166, 1171 (Idaho Ct. App. 2006). The community caretaking function arises

from the duty of police officers to help citizens in need of assistance and is totally

divorced from the detection, investigation, or acquisition of evidence relating to the

violation of a criminal statute. *Id*., 143 Idaho at 302, 141 P.3d at 1171; *State v. Maddox*,

137 Idaho 821, 824, 54 P.3d 464, 467 (Idaho Ct. App. 2002); *State v. Page*, 140 Idaho

841, 843, 103 P.3d 454, 457 (Idaho 2004).

**THIRD REVIEW ORDER - 4**

The "community caretaking function" permits an officer to detain a person when there is a present need for assistance, but does not permit unlimited searching of the detainee. *State v. Adams*, No. 50841, 2025 WL 2301197, at *4 (Idaho Aug. 11, 2025). Detention is not permitted if no present need for assistance is apparent. *State v. Hollist*, 170 Idaho 556, 561, 513 P.3d 1176, 1181 (Idaho 2022).

Police officers have a duty under the community caretaking function to investigate medical emergencies. *See In re Clayton*, 113 Idaho 817, 818, 748 P.2d 401, 402 (Idaho 1988). "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (per curiam).

A potentially suicidal person constitutes a medical emergency. "A heightened suicide risk or an attempted suicide is a serious medical need" for the purposes of the Fourteenth Amendment right to medical treatment. *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011).

In analyzing the community caretaking function, Idaho courts have adopted a totality of the circumstances test. *State v. Wixom*, 130 Idaho 752, 754, 947 P.2d 1000, 1002 (Idaho 1997). The federal constitutional standard is whether the intrusive action of the police was reasonable in view of all the surrounding circumstances. *Id.*, 130 Idaho at 754, 947 P.2d at 1002. Reasonableness is determined by balancing the public need and interest furthered by the police conduct against the degree and nature of the intrusion

upon the privacy of the citizen. *State v. Godwin*, 121 Idaho 491, 495, 826 P.2d 452, 456 (Idaho 1992).

Most federal circuit courts have analogized seizures on mental health grounds to a criminal arrest, requiring that seizures in the mental health and community caretaking context be supported by probable cause. *Ahern v. O'Donnell*, 109 F.3d 809, 817 (1st Cir. 1997) (collecting cases); *see Cloaninger ex rel. Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009) (involving officer's "welfare check" at residence after a doctor's 911 call reported a possible suicide attempt); *Roberts v. Spielman*, 643 F.3d 899, 905-06 (11th Cir. 2011) (holding that "a showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior").

The Fourth Circuit Court of Appeals explained the standard for probable cause for taking a mentally unstable person into custody on a welfare check as follows:

> Determining whether a person's Fourth Amendment rights have been violated in the mental health context requires us to determine whether the officials had probable cause to seize the person for an emergency mental evaluation. *See Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003). Such probable cause exists "when the facts and circumstances within the defendant's knowledge and of which the defendant had reasonably trustworthy information were sufficient to warrant a prudent man to believe that the person poses a danger to himself or others." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 172 (4th Cir. 2016) (internal quotation marks omitted).

> "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Wesby*, 138 S. Ct. at 586 (internal citations

and quotation marks omitted). It "is a practical, nontechnical
conception that addresses the factual and practical
considerations of everyday life on which reasonable and
prudent men, not legal technicians, act." *Bailey*, 349 F.3d at
739 (internal quotation marks omitted). This is particularly
true in the mental health context where police officers and
mental health professionals are called upon to make "a
number of difficult judgment calls" in their efforts to protect
both the individual and the public from potential dangers,
*Goines*, 822 F.3d at 170, and there is a "distinct lack of clarity
in the law governing seizures for psychological evaluations,"
*Raub*, 785 F.3d at 882 (internal quotation marks omitted).

*Barrett v. Pae Gov't Servs., Inc.*, 975 F.3d 416, 429 (4th Cir. 2020).[1]

Here, the totality of Plaintiff's pleadings, the Martinez Report, Officer Jayne's

Affidavit, and the body-camera videos with audio recordings show that the officers had

ample evidence to support probable cause to take Plaintiff into custody and transport him

to a hospital for a mental health evaluation.

Plaintiff admits that, on June 30, 2022, before Boise Police officers, including

Defendant John Jayne, came to Plaintiff's house, he and his wife had an argument about

his alcoholism, and he had sent "drunken texts" to his wife. *See* original Complaint, Dkt.

3. The texts show that Plaintiff expressed suicidal ideation. Dkt. 19-1 at 30-41. The texts

---

[1] The Fourteenth Amendment Due Process Clause governs involuntary confinement of the mentally ill by state actors who are medical personnel. *O'Connor v. Donaldson*, 422 U.S. 563, 573–76 (1975). But where law enforcement officers are involved in seizing and detaining a person "for whatever purpose," the Fourth Amendment is used for the analysis. *Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991), *as amended on denial of reh'g* (Apr. 1, 1992) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham*, 490 U.S. at 395.

also show that Plaintiff's wife told him in a text message that she was going to "call a welfare check." *Id*. at 41.

Officer Jayne's declaration and accompanying exhibits provide a quite comprehensive picture of the events that precipitated Plaintiff being taken into custody by officers. On June 30, 2022, Officer Jayne, who was serving as a Field Training Officer, and Officer Kashuba, his trainee, were dispatched to 6405 E. Columbia Rd. in Boise, Idaho due to a suicidal subject. Dkt. 19-1, Jayne Affidavit, at ¶ 3.

Officer Kashuba contacted the calling party, Ashley Warren, who was Plaintiff's wife. *Id*. at ¶ 4. Mrs. Warren informed Officer Jayne and Officer Kashuba that Plaintiff had texted her stating that he attempted to kill himself utilizing a pellet rifle loaded with a .22 caliber bullet, that she had found Plaintiff a week prior in the bathroom of their residence with a belt around his neck, and that he had previously remained in the garage of a prior residence with an idling vehicle, which Mrs. Warren thought was another suicide attempt. *Id*. Mrs. Warren also told officers that Plaintiff was intoxicated and stopped communicating with her. *Id*. at ¶ 5; Exhibit 3, Bodycam video/audio BC000025, entirety of telephone call between Ashley Warren and Officer Kashuba.

Due to the nature of the call and potential hazards, another unit was dispatched to the residence. Dkt. 19-1, Jayne Aff., at ¶ 8. The assisting officer was Sergeant Jason Pietrzak, working a patrol vehicle with Lieutenant Jeff Niiya. *See* Dkt. 19-1.

The bodycam videos/audios show what happened. After officers attempted to call Plaintiff's cellular telephone, without success, and many verbal requests were made through open windows to have him come to the front door, Plaintiff finally presented

himself outside his front door. Ashley Warren had notified police that there were large dogs in the house. When officers arrived, the dogs began barking. Dkt. 19-1, Exhibit 3, Bodycam video/audio BC000027.

Officer Kashuba asked if she could pat down Plaintiff Warren for weapons, and he allowed her to do so. Officer Jayne then asked Plaintiff to step away from the front door. Plaintiff refused to move. Officer Jayne placed his hands on Plaintiff momentarily and forced him to move a few feet to the side of the door. *See id.* At that point, Plaintiff became belligerent because he believed Officer Jayne had no right to touch him. Plaintiff continued to argue with the officers, while the officers remained calm and attempted to reason with Plaintiff. *See id.* The request for Plaintiff to step away from his front door was reasonable, to ensure that Plaintiff could not retreat into his residence and retrieve a weapon or let the dogs out to harm the officers. *Id.*

The bodycam footage shows that Plaintiff appeared intoxicated, slurring some of his words, and became argumentative, aggressive, and, at times, tearful. Clearly, he refused to cooperate with officers, even though they told him multiple times that his wife had contacted them to perform a welfare check because of recent past suicidal behaviors and current suicidal ideation expressed in text messages. Dkt. 19-1, Jayne Aff., at ¶¶ 12 – 13; Dkt. 19-1, Exhibit 3, BC000027. When officers asked Plaintiff about communications with his wife, he denied having sent any text messages that could be interpreted as suicidal ideation.

Plaintiff demanded the officers leave his property. Dkt. 19-1, Jayne Aff., at ¶ 14. Officer Jayne told Plaintiff that they could leave once he answered Officer Kashuba's

questions. *Id*. Plaintiff Warren then reiterated his demand, to which Officer Kashuba explained that the officers obtained permission to be there from Plaintiff's wife, Ashley Warren. Id. Plaintiff then told officers that the situation was "about to get really fucking ugly." *Id*. at ¶ 15; Dkt. 19-1, Exhibit 3, Bodycam video/audio BC000027.

Officer Jayne sought clarification about whether Plaintiff would cooperate and asked him whether he would answer Officer Kashuba's questions. Plaintiff stated that he would not. *Id*.

At this point in the interaction, Officer Jayne determined that Plaintiff's continued liberty posed an imminent danger of substantial physical harm to himself. Dkt. 19-1, Jayne Aff., at ¶ 16. Officer Jayne came to this conclusion based upon Mrs. Warren's phone call detailing Plaintiff's past suicide attempts and present suicide ideation, Plaintiff's text messages provided by Mrs. Warren, as well as Plaintiff's state of intoxication, which, through Officer Jayne's experience, he knew to be a risk factor contributing to successful suicides. *Id*. Pursuant to I.C. § 66-326(1), Officer Jayne determined it necessary to take Plaintiff into custody to bring him to a medical facility for an evaluation. *Id*.

It is clear from Plaintiff's pleadings, supplemented by the Martinez Report, Officer Jayne's affidavit, Mrs. Warren's phone call, Plaintiff's text messages, the police reports, and the bodycam footage that Officer Jayne had adequate grounds to believe that Petitioner posed a danger to himself. Plaintiff has failed to state a plausible Fourth Amendment claim upon which relief can be granted with allegations that he was arrested without probable cause during a welfare check.

**THIRD REVIEW ORDER - 10**

### 4. Excessive Force Claim

If police officers use excessive force during arrest procedures, a plaintiff may bring a § 1983 claim based upon the Fourth Amendment. *See Robins v. Harum*, 773 F.2d 1004 (9th Cir. 1985). To state a claim for excessive force, a plaintiff must provide facts showing (1) what the plaintiff did or said that led the defendant to think that physical force was necessary; (2) that the defendant used physical force on plaintiff in a malicious and sadistic way to cause harm, rather than in a good faith effort to maintain or restore discipline; (3) the defendant's stated or perceived reason for using physical force, if known; (4) whether the defendant made any effort to lessen or temper the severity of a forceful response; (5) why the amount of forced used was unreasonable; and (6) the extent of injury the plaintiff suffered. *See Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).

The question whether an officer has used excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime [or circumstance] at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (alteration added). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. In addition, the analysis must consider "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–397.

**THIRD REVIEW ORDER - 11**

Plaintiff prefaced his resistance to arrest with a statement to officers that the situation was "about to get really fucking ugly." This phrase alerted officers that a physical confrontation was imminent, and they acted reasonably under the circumstances to subdue Plaintiff.

Officer Jayne ordered Plaintiff to turn around and put his hands behind his back. Plaintiff did not cooperate, but said, "Don't touch me; tell me what I['ve] done wrong." Jayne tried to grasp Plaintiff's wrists and arms, but Plaintiff backed away to prevent contact. Jayne tried to grab Plaintiff's leg, but Plaintiff momentarily squatted to break loose. At this point, Officer Jayne's body camera stopped recording. The camera reactivated about one minute later. Officer Jayne declares that he did not intentionally de-activate it and was not aware that the camera had stopped and started recording until later when he reviewed the recording. Dkt. 19-1 at 15; Exhibit 3, BC000027(recording ended at 22:25:36) & BC000028 (recording started at 22:26:36).

Regardless, the body camera of Lieutenant Niiya continued to run during the gap in Jayne's body camera and fills in the time gap. The officers continued to try to catch or hold Plaintiff's extremities and told him to relax. From the time frame 22:26:15 to :30, Plaintiff yelled, "Get off of me, what have I done wrong?" You're choking me!" An officer responded, "Relax, no, I'm not." Plaintiff yelled, "Get off of my neck." The officer said, "I'm not on your neck." Plaintiff said, "Yeah, oh yeah. Nice try, fucker! Get off of me. What is the purpose of you trying to choke me?" Dkt. 19-1, Exhibit 4, BC000029 (22:26:15 to 30).

**THIRD REVIEW ORDER - 12**

Throughout the recording, officers are struggling to lay Plaintiff prone on the grass. Offices Kashuba and Lieutenant Niiya aided Officer Jayne in subduing Plaintiff. Three officers could not gain compliance. Sergeant Pietrzak stepped in to help. There is no clear picture of whether Plaintiff was placed in a chokehold or not.

However, the body camera footage from both officers shows that officers made every effort to obtain Plaintiff's cooperation at every turn, and Plaintiff continued to breathe and speak normally throughout the entire incident. No person in a tight chokehold could have continued to speak as Plaintiff did in the bodycam audio recording.

Plaintiff alleges that he suffered bruises, cuts, and abrasions to his neck; however, these also could have happened during the four-officer takedown after Plaintiff announced, "This is going to get fucking ugly," refused to comply with any request or command, and struggled against the officers.

At any time after Plaintiff was subdued, he did not verbally complain about injuries from having allegedly been in a 15-second chokehold. After the incident, Plaintiff continued to breathe and speak normally. *See* Dkt. 19-1, Exhibit 3, BC000027 & BC000028.  Instead of identifying injuries from the 15-second chokehold, he consistently complained that his handcuffs were too tight, followed by him consistently refusing to permit officers to loosen or replace them.

When a videotape quite clearly contradicts the plaintiff's version of facts, courts should view the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381-82 (2007). The totality of evidence, especially the bodycam footage, shows that

Plaintiff could normally speak and breathe during the entire incident, even during the 15 seconds he was complaining of being in a chokehold.

Even if a 15-second chokehold was used, the use of force was reasonable in the circumstances under the *Hudson* factors. Plaintiff's warning, "This is going to get fucking ugly," together with Plaintiff's wife's reports of near suicidal ideation, and Plaintiff's refusal to turn and be handcuffed led Officer Jayne to determine that physical force was necessary. The entirety of the camera footage shows that the officers acted with restraint and even compassion in dealing with Plaintiff, who was belligerent and verbally abusive.

The use of force clearly was for the purpose of controlling an unstable person and not for a malicious and sadistic purpose. Jayne's perceived reasons for the use of force are reasonable and logical and supported by the record. Jayne asked Plaintiff to cooperate before resorting to touching him, which was a reasonable effort to temper the severity of any forceful response. Only three of the officers attempted to restrain him at first, indicative of a tempered response, but a fourth was needed to be able to handcuff Plaintiff.

The amount of force was reasonable, even if there was an intentional or perceived chokehold for up to 15 seconds; the reasonableness is supported by the fact that Plaintiff continued breathing and loudly yelling without stopping. If, indeed, a chokehold was used for 15 seconds, it was de minimis and is not actionable as excessive force.

These officers were charged with the difficult and unpleasant task of attempting to help someone who did not want to be helped, but, under the Idaho Code, they were required to assess Plaintiff and deliver him to mental health professionals with as little

**THIRD REVIEW ORDER - 14**

damage to him and themselves as possible. They succeeded. Plaintiff may not proceed on an allegation of excessive force for lack of sufficient facts to support such a claim.

**5. Claim of Unlawful Placement in Mental Health Facility**

Plaintiff also alleges that Officer Jayne unnecessarily placed Plaintiff in an involuntary medical hold in the Intermountain Hospital for a period of 144 hours. The United States Supreme Court has held that, to support a short-term *non*-emergency hold, the state must prove mental illness and imminent dangerousness beyond a mere preponderance of the evidence. *Suzuki v. Yuen,* 617 F.2d 173, 178 (9th Cir. 1980). In the context of a short-term *emergency* hold, however, by definition there is no prior adjudication of the detainee's condition, because the very purpose of the hold is to *evaluate whether* the person is mentally ill and dangerous and thus should be subjected to such an adjudication. The question then becomes what degree of certainty a doctor must possess that an individual is both mentally ill and dangerous before the doctor may order or continue an involuntary, short-term emergency commitment.

Because Officer Jayne is not a medical professional, the Court concludes that all that was required of him was to determine the existence of probable cause to detain an unstable person and to transport the person to a hospital where a mental health evaluation could take place. Nothing in the pleadings or the record shows that Officer Jayne took any other actions to cause medical providers to detain Plaintiff at the hospital beyond the moment when Officer Jayne delivered him to the hospital for evaluation. Any decision of the medical and mental health providers who evaluated Plaintiff cannot be attributed to Officer Jayne. These allegations fail to state a claim upon which relief can be granted.

**THIRD REVIEW ORDER - 15**

A pro se litigant bringing a civil rights suit must have an opportunity to amend the complaint to overcome deficiencies unless it is clear that they cannot be overcome by amendment. *See Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000). A pro se pleading may be dismissed without notice of the deficiencies and an opportunity to amend if a complaint "lacks merit entirely" and "cannot be saved" by amendment. *Id.*, at 1129. Plaintiff has had opportunity to amend. His allegations are implausible on this expanded record. Therefore, this case will be dismissed with prejudice for failure to state a claim upon which relief can be granted.

## ORDER

**IT IS ORDERED:**

1. Plaintiff's Motion to Hear and Motion to Rule on Motion to Hear (Dkt. 27, 30) are GRANTED to the extent that this Court has entered a third screening order.

2. This case is DISMISSED with prejudice for failure to state a claim upon which relief can be granted. No further amendment will be considered.

DATED: October 15, 2025

Honorable Debora K. Grasham
United States Magistrate Judge

**THIRD REVIEW ORDER - 16**